AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Western District of Washington

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| The Google account xanderg2488@gmail.com, hosted at premises controlled by Google LLC, located at 1600 Amphitheater Parkway, Mountain View, CA 94043, as further described in Attachment A | ) ) ) ) |

Case No. **MJ19-014**

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
The Google account xanderg2488@gmail.com, hosted at premises controlled by Google LLC, located at 1600 Amphitheater Parkway, Mountain View, CA 94043, as further described in Attachment A

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B for a list of information to be disclosed

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, U.S.C. § 1343 | Wire Fraud |

The application is based on these facts:

See attached Affidavit of Special Agent Milas Howe

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Milas Howe, Special Agent FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 01/14/2019 _____

_____
*Judge's signature*

City and state: Seattle, Washington

United States Magistrate Judge Paula L. McCandlis
*Printed name and title*

# AFFIDAVIT OF SPECIAL AGENT MILAS HOWE

STATE OF WASHINGTON          )
                             )          ss
COUNTY OF KING               )

I, Milas Howe, a Special Agent with the Federal Bureau of Investigation in Seattle

Washington, having been duly sworn, state as follows:

## **INTRODUCTION**

1.      ***Affiant Background***:  I am a Special Agent with the Federal Bureau of

Investigation (FBI), assigned to the White Collar Crime Squad of the Seattle, Washington

Headquarters Field Office. I have worked with the FBI since May 2017.  I am responsible

for investigating violations of federal statutes governing various types of white collar

crime, including wire fraud, mail fraud, bank fraud, securities fraud, money laundering,

and theft of government and public money. Prior to working for the FBI, I spent over ten

years in the accounting industry working as both an internal and external auditor.  I am a

licensed Certified Public Accountant, Certified Fraud Examiner, and Certified

Information Systems Auditor.

2.      ***Purpose and Scope of the Affidavit***:  The FBI has been investigating

allegations that Keenan Gracey defrauded investors out of millions of dollars between

2016 and 2018 by purporting to sell them "pre-IPO" stock to which he claimed to have

special access, but which he in fact did not own and had no authority to sell.  The matter

came to the FBI's attention through a referral from the Securities and Exchange

Commission ("SEC").  My investigation has included witness interviews, the review of

documents, including financial records, email and text communications and other

documents, and of materials prepared and obtained by the SEC in its investigation of

Gracey.  Based on my review of this evidence, and as discussed below, there is probable

cause to believe that Gracey defrauded investors of approximately $6 million through

fraudulent stock sales, and thereby committed the crime of wire fraud in violation of Title

18, United States Code, Section 1343.

Affidavit of Milas Howe - 1

1    3.      This Court previously issued a warrant for Gracey's arrest, and a warrant to

2    search an email account used by Gracey with the address "tijor24@gmail.com."

3    Evidence developed since that time establishes that, Gracey's fraud was discovered by

4    the SEC, Gracey began using used a second email account with the address

5    "xanderg2488@gmail.com" (the "Subject Account") in connection with his fraud, which

6    continued until December 2018.  This Affidavit establishes probable cause to support the

7    issuance of a warrant to search the Subject Account for additional evidence of violations

8    of Title 18, United States Code, Section 1343.

9    4.      The information set forth in this Affidavit is not intended to detail each and

10   every fact and circumstance of the investigation or all information known to me or the

11   investigative participants.  Rather, this Affidavit is intended to present the facts relevant

12   to the issue of whether probable cause exists to issue the requested search warrant.

13                              **JURISDICTION**

14   5.      This Court has jurisdiction to issue the requested warrant because it is "a

15   court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  Specifically, the Court

16   is "a district court of the United States . . . that has jurisdiction over the offense being

17   investigated." 18 U.S.C. § 2711(3)(A)(i).

18                    **STATEMENT OF PROBABLE CAUSE**

19   A.    **Background**

20   6.      Many of the facts relevant to this investigation are described in detail in the

21   attached Complaint (Appendix 1), which is incorporated herein by reference.  As

22   explained therein, witness statements, documents, and other evidence establish that

23   Keenan Gracey is a Canadian national who has lived primarily in Washington since at

24   least 2006.  Gracey has no particular background in business or finance.  However,

25   beginning no later than June 2016, Gracey began portraying himself to others as a British

26   billionaire and financier.  To support this image, Gracey rented houses worth millions or

27   tens of millions of dollars, and told potential investors that he was the owner of those

28

Affidavit of Milas Howe - 2

1    estates. Gracey also rented high-end automobiles, including a Ferrari, a Maybach, a

2    Rolls Royce, and a Lamborghini, and represented those vehicles as his own.

3           7.    As set forth in the Complaint, the evidence establishes that Gracey

4    identified people with money to invest ("victims"), and told the victims that Gracey had

5    special access to "pre-IPO" shares of a company that Gracey said would go public

6    through an initial public offering ("IPO") in the near future. Gracey told the victims that

7    the value of the shares would increase by a factor of 50 or more when the company

8    conducted an initial public offering in the near future.

9           8.    Between mid-2017 and May 2018, Gracey told victims that the company

10    whose stock he was selling would be the product of a merger between three government

11    contracting companies called "DXC," "Keypoint," and "Vencore." While Gracey

12    initially told victims that the name of the soon-to-be-formed company was secret, he later

13    told them that the name of the company was "Perspecta." DXC, Keypoint and Vencore

14    are legitimate companies, and in fact jointly entered into a transaction creating a company

15    called Perspecta. However, representatives of these companies have told the government

16    that Gracey had no relationship to any of the companies, owned no Perspecta stock, and

17    no authority to sell it.

18           9.    Based on these representations, victims "purchased" Perspecta shares from

19    Gracey for approximately $4 million. However, instead of transferring the promised

20    securities, Gracey simply stole the victims' money, and used much of it to fund his

21    lifestyle, including the rentals of high-end estates and automobiles. The majority of

22    Gracey's victims were residents of the Seattle, Washington and Los Angeles, California

23    metropolitan areas.

24           10.    On May 10, 2018, the Securities and Exchange Commission ("SEC") filed

25    a civil complaint in the Central District of California alleging that Gracey engaged in

26    securities fraud in violation of the Securities Act of 1933 and the Securities Exchange Act

27    of 1934. *See* Central District of California Cause No. CV18-3872AB (the "SEC

28    Action"). On May 10, 2018, United States District Judge Andre Birotte issued a

temporary restraining order that, *inter alia*, enjoined Gracey from selling securities.  SEC Action Dkt. 4.  On September 27, 2018, Judge Birotte granted the SEC's Motion for Default Judgment.  SEC Action Dkt. 23.  On November 5, 2018, Judge Birotte ordered a permanent injunction prohibiting Gracey from selling securities.  *Id.*  Judge Birotte also ordered Gracey to disgorge $4,403,500, finding that the "SEC submitted evidence that Gracey had obtained $4,403,500 through his wrongful conduct." *Id.*  Finally, Judge Birotte ordered an additional civil penalty of $4,403,500. *Id.*

11.     On November 9, 2018, I endorsed a Complaint in this Court charging Gracey with wire fraud for the scheme described above.  The Court issued a warrant for Gracey's arrest, as well as a warrant to search an email account that Gracey used to communicate with victims (the "Tijor24 Gmail Account").  On December 20, 2018, FBI agents arrested Gracey outside of the Airport Courthouse in Los Angeles, California.

12.     On January 3, 2019, a Seattle grand jury returned an indictment charging Gracey with ten counts of wire fraud.  The indictment charges Gracey with the conduct described above, as well as the additional fraudulent stock offering described below.

**B.     Evidence of Additional Fraud by Gracey**

13.     Following the issuance of the arrest and search warrant, I discovered that Gracey had continued to engage in fraud even after the SEC obtained a temporary restraining order against Gracey.

14.     Specifically, my review of the Tijor24 Gmail Account revealed communications between Gracey and a Washington resident ("Victim 1") about Gracey selling securities to Victim 1.  I interviewed Victim 1 on December 28, 2018.  Victim 1 had met Gracey years earlier when Victim 1 had worked with Gracey's father, and Victim 1 had employed Gracey as Victim 1's personal trainer.  Victim 1 reported that, in June 2018 (following the entry of the temporary restraining order in the SEC action), Gracey contacted Victim 1 and told him that Gracey had an investment opportunity.  Gracey explained that there was an initial public offering that was being planned as a joint venture by two companies called Beam Therapeutics and Editas Medicine.  Gracey

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

explained that he had access to pre-IPO shares of the company, which he could sell for $1 per share. Gracey said that the value of the shares would increase to $50 per share when the company went public. Victim 1 stated that he personally invested $400,000 with Gracey. In addition, Victim 1 contacted other investors he knew and told them about the opportunity, and these other investors invested directly with Gracey between June and November 2018.

15. Victim 1 provided documents, including text messages, bank records and share purchase agreements, corroborating his statements. The text messages contained numerous pictures and statements in which Gracey presented himself as an extremely wealthy and successful investor. For example, on June 3, 2018, Gracey texted Victim 1 the photograph shown below, which depicts Gracey standing in front of a luxury sports car, which itself is parked in front of the Beverly Hills mansion that Gracey claimed to own:



In another text message sent the same day, Gracey told Victim 1 that "you don't need an MBA to do this, you need to know the right people to put the deal together. We're finalizing series A round funding of something called Beam Therapeutics, a spinoff from Editas Medicine." Gracey goes on to state that the company "will easily trade at $50 per

Affidavit of Milas Howe - 5

1  share on its IPO. 50X roi." I know from my training and experience that the initials

2  "roi" are used in the investment context to mean "return on investment."

3       16.  As with Perspecta (the company that was the subject of Gracey's previous

4  fraudulent offering), Beam Therapeutics is a genuine corporation. I interviewed the

5  Chief Executive Officer and the interim Chief Financial Officer of Beam Therapeutics.

6  Both confirmed that Keenan Gracey does not own any shares of the company and has no

7  relationship to it.

8       17.  Gracey texted Victim 1 many documents associated with the fraud. For

9  example, on July 23, 2018, Gracey texted Victim 1 a bank statement, which I know to be

10  falsified, purporting to show that the balance on Gracey's checking account exceeded

11  $117,000,000. On November 1, 2018, Gracey texted Victim 1 a document from

12  Deutsche Bank which, Gracey claimed, showed that a company owned by Gracey had

13  just received a transfer of €500,000,000 euros. On November 2, 2018, Gracey texted

14  Victim 1 a document purporting to be a stock certificate reflecting that Gracey owned 10

15  million shares of Beam Therapeutics stock. This certificate is similar to documents that

16  Gracey created in connection with his original fraud scheme. The Beam Therapeutics

17  representatives referenced above confirmed that this certificate is fraudulent.

18       18.  In addition, Victim 1 provided the FBI with 18 fraudulent signed "Share

19  Purchase Agreements" dated between June and November 2018. The agreements are

20  nearly identical to the agreements used in Gracey's fraudulent promotion of Perspecta

21  shares, and purport to sell victims shares of stock in a company to be created by Beam

22  Therapeutics and Editas Medicine. Some of the agreements provided by Victim 1 refer

23  to the company to be created as "Moderna." The documents memorialize that Gracey

24  collected more than $2 million from victims after the SEC obtained an order forbidding

25  Gracey from selling securities. In addition, two versions of this agreement were retrieved

26  in the search of the Tijor24 Gmail Account.

27       19.  The Tijor24 Gmail Account contains further evidence of additional fraud

28  that the FBI is continuing to investigate. For example, the Tijor24 Gmail Account also

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  contains numerous emails and attachments from September and October 2018 relating to
2  a purported joint venture agreement between "Strider Enterprises," and another
3  individual ("Person 1"). The document identifies "Xander Gracey" as the director of
4  Strider Enterprises. According to the document, Strider and Person 1 will contribute a
5  total of €500 million euros to the joint venture, which will be deposited into an HSBC
6  account known to be controlled by Gracey.

7      20.    The Tijor24 Gmail Account also contains numerous emails in October 2018
8  relating to a supposed British company called Blixton Capital Limited ("Blixton"). The
9  documents indicate that HSBC Holdings PLC issued a bond valued at €1 billion euros in
10 favor of Blixton. Email correspondence between the Tijor24 Gmail Account and First
11 Republic Bank in Los Angeles indicates that Gracey submitted copies of the purported
12 bond to First Republic, and that Gracey and Person 1 subsequently arranged to meet with
13 bank representatives about the bond. Internal First Bank Republic documents indicate
14 that the bank identified the transaction as fraudulent and cancelled the meeting.

15 **C.    The Subject Account**

16     21.    My review of the Tijor24 Gmail Account has produced evidence that
17 Gracey created and used the Subject Account to continue his fraud following the entry of
18 the SEC temporary restraining order in May 2018. The Tijor24 Gmail Account contains
19 an email from the Google "Gmail Team" sent on May 30, 2018. The email says that
20 "your Gmail address, xanderg2488@gmail.com [the address of the Subject Account] has
21 been created." I know from my training and experience that, when a user creates a Gmail
22 account, the user is prompted to enter the email address of an existing account. When the
23 new account is created, Google will send a notice, such as the May 30, 2018 email, to the
24 existing account to notify the user that the account has been created.

25     22.    The Tijor24 Gmail Account also contains an email sent from the Subject
26 Account to the Tijor24 Gmail Account on May 30, 2018. The body of the email simply
27 states "hi." Notably, the name of the sender for the Subject Account appears as "Xander
28 Gracey." "Xander" is a derivation of Keenan Gracey's middle name, which is

Affidavit of Milas Howe - 7

1  Alexander.  My review of other case materials, such as investment agreements and
2  communications with investors, indicates that Gracey began using the name "Xander
3  Gracey" at times following the filing of the SEC lawsuit against "Keenan Gracey."  I
4  know from my training and experience that persons who have been publicly exposed as
5  committing fraud will sometimes use alias names to prevent new victims from
6  discovering their past fraudulent transactions.  Gracey's creation of a new account that
7  uses an alias (Xander Gracey) as the sender's name may have been intended to serve this
8  purpose.

9       23.   The Tijor24 Gmail search warrant return shows that Gracey used the
10 Subject account to communicate with potential victims.  For example, the Tijor24 Gmail
11 Account contains an email string between the Subject Account and a potential investor.
12 The string begins with a May 30, 2018 email from the Subject Account in which Gracey
13 states that "email is always the best way to reach me, especially in Beverly Hills where
14 the reception is so spotty."  Gracey, using the Subject Account, invites the investor to
15 "lunch on Friday at our estate in Beverly Hills" and says that "I think you may be
16 interested in what we are moving on right now in the gene editing world and how we
17 intend to take this public through an IPO, as we have already done in the past through
18 CRiSPR Cas9 IPO via Editas Medicine."  The string contains several more emails
19 between Gracey (using the Subject Account) and the potential investor in which the two
20 arrange a meeting.  Gracey then sends an additional email thanking the investor for the
21 meeting and providing more information about his offer, including that the investment
22 will produce a "50x roi."  Gracey forwarded this string from the Subject Account to the
23 Tijor24 Gmail Account, which is why the email was retrieved as part of the search of the
24 Tijor24 Gmail Account.

25       24.   The Tijor24 Gmail Account search warrant return also shows that Gracey
26 sent numerous fraudulent documents from the Subject Account to the Tijor24 Gmail
27 Account.  For example, on June 2, 2018, an email with the subject line "xander.docx"
28 was sent from the Subject Account to the Tijor24 Gmail Account.  Attached to the email

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  was a model "Share Purchase Agreement" in Microsoft Word format. The model

2  agreement is nearly identical to those discussed above and provided to victims of the

3  scheme. This version states that "Xander Gracey" is the owner of shares of a company

4  produced by the merger of parts of Beam Therapeutics and Editas Medicine. The

5  document contains blank spaces to add the name of the purchaser, the number of shares,

6  and the purchase price. Gracey resent the same document from the Subject Account to

7  the Tijor24 Gmail Account on June 14, 2018.

8      25.   On October 21, 2018, an email with the subject line "requested

9  documentation" was sent from the Subject Account to a relative of Keenan Gracey with a

10  copy to the Tijor24 Gmail Account. Attached to the email are several documents relating

11  to Blixton Capital Management, including a corporate resolution, a power of attorney,

12  and a document that appears to reflect a note in favor of Blixton in the amount of

13  €1,500,000,000 euros. As discussed above, Gracey later submitted similar documents to

14  First Republic Bank in Los Angeles, California. On November 2, 2018, the Subject

15  Account sent another email to the Tijor24 Gmail Account attaching additional legal,

16  corporate and financial documents relating to Blixton. Among the attachments was a

17  copy of the $1 billion note that Gracey submitted to First Republic Bank.

18      26.   On November 2, 2018, the Subject Account sent an email titled "Document

19  (1).docx" to the Tijor24 Gmail Account. The attachment is a Microsoft Word document

20  that purports to be an unsigned stock certificate memorializing that Keenan Gracey owns

21  10 million shares of Beam Therapeutics stock. This version of the document is unsigned.

22  As discussed above, the same day, Gracey sent Victim 1 a signed copy of this document

23  in connection with his fraudulent offering to Victim 1 and investors recruited by Victim

24  1.

25      27.   All of these emails establish probable cause to believe that Gracey used the

26  Subject Account in furtherance of his fraud scheme, and that the account may contain

27  evidence of his violations of Title 18, United States Code, Section 1343.

28

Affidavit of Milas Howe - 9

# BACKGROUND CONCERNING EMAIL

26.     In my training and experience, I have learned that Google provides a variety of on-line services, including electronic mail ("email") access, to the public. Google allows subscribers to obtain email accounts under different domain names, including "gmail.com" and "googlemail.com."[1]  Subscribers obtain an account by registering with Google.  During the registration process, Google asks subscribers to provide basic personal information.  Therefore, the computers of Google are likely to contain stored electronic communications (including retrieved and unretrieved email for Google subscribers) and information concerning subscribers and their use of Google services, such as account access information, email transaction information, and account application information.  In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.  Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities, and can provide evidence of the subscriber's intent to conceal his or her identity.

27.     A Google email subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures (other than ones attached to emails), and other files, on servers maintained and/or owned by Google.  In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

28.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Email

---

[1] While Google is most commonly known to issue email addresses for the "@gmail.com" domain, it has also issued addresses for the "@googlemail.com" domain.

Affidavit of Milas Howe - 10

1  providers typically retain records about such communications, including records of

2  contacts between the user and the provider's support services, as well as records of any

3  actions taken by the provider or user as a result of the communications. In my training

4  and experience, such information may constitute evidence of the crimes under

5  investigation because the information can be used to identify the account's user or users.

6      29.    Information stored in connection with an email account may provide crucial

7  evidence of the "who, what, why, when, where, and how" of the criminal conduct under

8  investigation, thus enabling the United States to establish and prove each element or

9  alternatively, to exclude the innocent from further suspicion.  In my training and

10  experience, the information stored in connection with an email account can indicate who

11  has used or controlled the account.  This "user attribution" evidence is analogous to the

12  search for "indicia of occupancy" while executing a search warrant at a residence.  For

13  example, email communications, contacts lists, and images sent (and the data associated

14  with the foregoing, such as date and time) may indicate who used or controlled the

15  account at a relevant time.

16      30.    Information maintained by the email provider can show how and when the

17  account was accessed or used.  For example, email providers typically log the Internet

18  Protocol (IP) addresses from which users access the email account, along with the time

19  and date of that access.  By determining the physical location associated with the logged

20  IP addresses, investigators can understand the chronological and geographic context of

21  the email account access and use relating to the crime under investigation. This

22  geographic and timeline information may tend to either inculpate or exculpate the

23  account owner.  Additionally, information stored at the user's account may further

24  indicate the geographic location of the account user at a particular time (e.g., location

25  information integrated into an image or video sent via email).

26  **CONCLUSION**

27      31.    Based on the forgoing, I request that the Court issue the proposed search

28  warrant.  Because the warrant will be served on Google, who will then compile the

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    requested records at a time convenient to it, reasonable cause exists to permit the

2    execution of the requested warrant at any time in the day or night.

3

4

                         MILAS HOWE

5                          Special Agent

6                          Federal Bureau of Investigation

7

8    SUBSCRIBED AND SWORN before me on January 14, 2018.

9

10

11   PAULA L. MCCANDLIS

12   United States Magistrate Judge

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# ATTACHMENT A

## Property to Be Searched

This warrant applies to information associated with the Google account with the assigned email address xanderg2488@gmail.com.  The information is stored at premises owned, maintained, controlled, or operated by Google LLC, a company headquartered at 1600 Amphitheater Parkway, Mountain View, CA 94043.

Attachment A - 1

# ATTACHMENT B

## Particular Things to be Seized

**I.      Information to be disclosed by Google LLC (the "Provider")**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to the Provider, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f) on September 11, 2018, the Provider is required to disclose the following information to the government for the account identified in Attachment A:

a.      For the period May 30, 2018 to the present, the contents of all emails associated with the account, including stored or preserved copies of emails sent to and from the account, draft emails, the source and destination addresses associated with each email, and all attachments associated with each email, along with the date and time at which each email was sent, and the size and length of each email;

b.      All subscriber records or other information regarding the identification of the account user, to include: 1) names, email addresses, and screen names; 2) physical addresses; 3) records of session times and durations; 4) length of service (including start date) and types of services utilized; 5) telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address such as internet protocol address, media access card addresses, or any other unique device identifiers recorded by Google in relation to the account; 6) account log files (login IP address, account activation IP address, and IP address history); 7) detailed billing records/logs; 8) means and source of payment; and 9) lists of all linked or related accounts;

c.      Information reflecting the types of Google services utilized by the user of the account;

d.      All records or other information stored by any individual using the account, including address books, contact and buddy lists, Google Calendar content, Google Drive content; Google Photos content; and Google Web & Activity content; and

Attachment B - 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

e.      All account history, including any records of communications between Google and any other person about issues relating to the accounts, such as technical problems, billing inquiries, or complaints from other users about the specified account.  This is to include records of contacts between the subscriber and the provider's support services, as well as records of any actions taken by the provider or subscriber in connection with the service.

The Provider is hereby ordered to disclose the above information to the government within 14 days of the service of this warrant.

**II.      Information to be seized by the government**

Upon receipt of the information described in Section I, the government shall review the production and may seize the following material:

All information described above in Section I that constitutes evidence and instrumentalities of violations of Title 18, United States Code, Section 1343, those violations involving Keenan Gracey and occurring after January 1, 2016, including communications or information pertaining to the following matters:

a.      Content referring or relating to any security, loan, or other investment, including material relating to the purchase, sale, or offer for sale of any security or other investment;

b.      Content referring or relating to any of the following business entities:

        i.      Perspecta, Inc.;

        ii.      DXC Technology Company;

        iii.      Keypointe Government Solutions;

        iv.      Vencore, Inc.;

        v.      Beam Therapeutics, Inc.

        vi.      Editas Medicine;

        vii.      Moderna;

        viii.      Blixton Capital, Ltd; or

        ix.      Strider Enterprises.

c.      Any communication with any person to whom Gracey is known to have sold or offered to sell any security or other investment, as well as transactional records memorializing those communications;

Attachment B - 2

d.      Statements by Gracey about his or his family's purported wealth, background, education, investment experience, and ownership of, or access to, securities;

e.      Content evidencing Gracey's actual wealth or absence thereof, background, education, investment experience, and ownership of, or access to, securities;

f.      Photographs of automobiles, residences, or financial or legal documents;

g.      Content evidencing the actual use or disposition of any funds collected by Gracey from any person in connection with the sale or offer for sale of any investment;

h.      Content evidencing how and when the email account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the email account owner; and

i.      Content that serves to identify any person who uses or accesses or who exercises in any way any dominion or control over the Subject Account.

Attachment B - 3

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Google, and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Google. The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Google, and they were made by Google as a regular practice; and

b.      such records were generated by Google electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Google in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by Google, and at all times pertinent to the records certified here the process and system functioned properly and normally.

Certificate 902 - 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1      I further state that this certification is intended to satisfy Rules 902(11) and

2   902(13) of the Federal Rules of Evidence.

3

4

5   _____          _____

    Date                               Signature

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Certificate 902 - 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# Appendix 1

1

The Honorable Paula L. McCandlis

2

3

4

5

6

7           UNITED STATES DISTRICT COURT FOR THE

8              WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10  UNITED STATES OF AMERICA,        CASE NO.

11          Plaintiff            **COMPLAINT for VIOLATION**

12

13                         Title 18 U.S.C. § 1343

14           v.

15  KEENAN A. GRACEY a/k/a KEENEN A.
GRACEY,

16           Defendant.

17

18

19       BEFORE, the Honorable Paula L. McCandlis, United States Magistrate Judge,

20  U.S. Courthouse, Seattle, Washington.

21       The undersigned complainant, being duly sworn, states:

22                   **<u>COUNT ONE</u>**
**(Wire Fraud)**

23  **A.**    **The Scheme to Defraud**

24       1.    Beginning no later than in or about June 2016, and continuing until about

25  May 2018, at Clyde Hill, within the Western District of Washington, and elsewhere,

26  KEENAN A. GRACEY, a/k/a KEENEN A. GRACEY ("GRACEY"), devised and

27  intended to devise a scheme and artifice to defraud, and to obtain money and property by

28  means of materially false and fraudulent pretenses, representations and promises.

United States v. Keenan Gracey
Complaint-1

1  2.  The essence of the scheme and artifice to defraud was for GRACEY to

2 falsely represent himself as a wealthy businessman who could offer investors special

3 access to "pre-IPO" stock in a soon-to-be-formed company, which, GRACEY promised,

4 would produce returns of up to 60 times the original investment when the company

5 conducted an initial public offering. GRACEY collected millions of dollars from victims

6 by purporting to "sell" them this stock, when in fact GRACEY did not own or have

7 access to any such stock and had no authority to sell it.

8 **B.**  **Manner and Means**

9  GRACEY operated in the following manner, and employed the following means,

10 to accomplish his scheme and artifice to defraud:

11  3.  GRACEY falsely presented himself to potential investors as a successful

12 businessman from an extremely wealthy English family. GRACEY told investors that

13 GRACEY's great-grandfather was the "lord commander of the British empire" and a co-

14 founder of both the General Dynamics Corporation and Lloyd's of London. GRACEY

15 falsely told investors GRACEY had graduated from the London School of Economics;

16 had earned a Master's Degree in finance from Oxford University; and had become a

17 successful businessman with hundreds of millions of dollars in investments.

18  4.  GRACEY used deceptive means to create the appearance that he was

19 indeed a wealthy investor. GRACEY rented multi-million dollar estates in Beverly Hills,

20 and San Diego, California; and Clyde Hill and Newcastle, Washington. GRACEY

21 entertained potential investors at these estates and represented himself as the owner.

22 Similarly, GRACEY rented luxury automobiles and told investors that he was the owner

23 of those cars. GRACEY falsified a bank statement to make it appear that he had

24 hundreds of millions of dollars of cash on hand, and showed the bank statement to

25 potential investors as evidence of his own wealth.

26  5.  GRACEY identified people (referenced hereafter as "victims") with money

27 to invest and/or relationships with others who had money to invest. GRACEY offered

28 the victims what GRACEY characterized as a "once in a lifetime" business opportunity.

United States v. Keenan Gracey
Complaint-2

1  GRACEY said this opportunity involved purchasing "pre-IPO" shares in a company that,

2  GRACEY represented, had planned an initial public offering ("IPO"). GRACEY said

3  that, at the time of the IPO, the investors would be able to sell their shares at a profit of

4  50 to 60 times the initial investment. Initially (during 2016 and part of 2017), GRACEY

5  described the company as virtual reality startup, and claimed to sit on the company's

6  board of directors.

7       6.    Beginning in the fall of 2017, GRACEY told victims that the "pre-IPO"

8  shares he was offering were shares in a new business entity that would be formed by the

9  merger of three government contracting companies. GRACEY identified the merging

10  companies as "DXC," "KeyPoint," and "Vencore," and the new entity to be formed as

11  "Perspecta." GRACEY provided victims with a copy of a DXC-created presentation,

12  which is available on DXC's website, describing the planned transaction and its

13  anticipated business benefits. GRACEY provided some potential victims with phony

14  share purchase agreements, which purported to convey the Perspecta shares to the buyer.

15       7.    While it was true that DXC, KeyPoint, and Vencore were legitimate

16  businesses planning a merger, GRACEY had no connection to any of these companies.

17  GRACEY did not own any securities related to Perspecta, DXC, KeyPoint, or Vencore,

18  and therefore could not convey any of the securities that he purported to offer for sale.

19       8.    GRACEY collected millions of dollars in "investments" from victims who

20  believed they were purchasing the pre-IPO securities described by GRACEY. In some

21  cases, at GRACEY's direction, victims provided the money to GRACEY by interstate

22  wire transmission, including transmissions originating in Washington. In other cases,

23  GRACEY requested that the investors provide GRACEY with the investment money in

24  cash.

25       9.    When some of the victims became suspicious of GRACEY and demanded

26  that GRACEY return their investment principal, GRACEY attempted to lull the investors

27  by providing false reasons why he could not return the money. For example, GRACEY

28  told victims that returning the money would constitute securities fraud or would

United States v. Keenan Gracey
Complaint-3

1   otherwise raise suspicions from the government.  When victims persisted in demanding

2   their money back, GRACEY prepared and executed loan agreements in which he

3   promised to repay the money.  When GRACEY signed these agreements, GRACEY had

4   no intention of making the promised payments.

5   **C.    Execution of the Scheme to Defraud**

6          10.    On or about December 30, 2017 at Bellevue, within the Western District of

7   Washington, and elsewhere, for the purpose of executing and attempting to execute this

8   scheme and artifice to defraud, KEENAN GRACEY, and others known and unknown to

9   the complainant, did knowingly transmit and cause to be transmitted by wire

10  communication in interstate and foreign commerce, writings, signs, signals, pictures and

11  sounds, in that KEENAN GRACEY caused Victim 1 to initiate an interstate wire

12  transmission in the form of an $80,000 wire transfer originating in Washington and

13  terminating in California.

14         All in violation of Title 18, United States Code, Section 1343 and Section 2.

15                                           ***

16         And the complainant states that this Complaint is based on the following

17  information:

18         I, Special Agent Milas Howe, being first duly sworn on oath, depose and say:

19  **AFFIANT BACKGROUND AND SCOPE OF AFFIDAVIT**

20         1.     I am a Special Agent with the Federal Bureau of Investigation (FBI),

21  assigned to the White Collar Crime Squad of the Seattle, Washington Headquarters Field

22  Office. I have worked with the FBI since May 2017.  I am responsible for investigating

23  violations of federal statutes governing various types of white collar crime, including

24  wire fraud, mail fraud, bank fraud, securities fraud, money laundering, and theft of

25  government and public money. Prior to working for the FBI, I spent over ten years in the

26  accounting industry working as both an internal and external auditor.  I am a licensed

27

28

United States v. Keenan Gracey
Complaint-4

1  Certified Public Accountant, Certified Fraud Examiner, and Certified Information

2  Systems Auditor.

3      2.      The FBI has been investigating allegations that KEENAN GRACEY a/k/a

4  KEENEN GRACEY ("GRACEY") defrauded investors out of millions of dollars

5  between 2016 and 2018.  This matter came to the FBI's attention through a referral from

6  the Securities and Exchange Commission ("SEC").  My investigation has included

7  witness interviews, the review of documents, including financial records, email and text

8  communications and other documents, and of materials prepared and obtained by the

9  SEC in its investigation of GRACEY.  The information set forth in this Affidavit is not

10  intended to detail each and every fact and circumstance of the investigation or all

11  information known to me or the investigative participants.  Rather, this Affidavit is

12  intended to present the facts relevant to the issue of whether probable cause exists to

13  believe that GRACEY committed the crime alleged above.

## EVIDENCE OF THE CRIMINAL OFFENSE

15  **A.      The SEC Action**

16      3.      On May 10, 2018, the SEC filed a complaint in the Central District of

17  California alleging that GRACEY engaged in securities fraud in violation of the

18  Securities Act of 1933 and the Securities Exchange Act of 1934.  *See* Central District of

19  California Cause No. CV18-3872AB (the "SEC Action").

20      4.      The SEC's Complaint alleged that GRACEY falsely portrayed himself as a

21  wealthy investor with special access to "pre-IPO" shares of a company to be formed

22  under the name "Perspecta, Inc."  The SEC Complaint alleged that GRACEY had taken

23  over $2 million from investors, purportedly in exchange for the Perspecta shares.  In fact,

24  the Complaint alleged, GRACEY was not a wealthy investor; had no relationship with

25  Perspecta or any of its affiliate companies; and did not own any of its stock.  In a Motion

26  for a Temporary Restraining Order accompanying the Complaint, the SEC alleged that

27  "in short, Gracey under the guise of having access to valuable pre-IPO shares, is simply

28  stealing money from investors."  SEC Action Dkt. 6 at 1.

United States v. Keenan Gracey
Complaint-5

1    5.    On May 10, 2018, United States District Judge Andre Birotte issued a

2 temporary restraining order that, *inter alia,* enjoined GRACEY from selling securities,

3 imposed a freeze on Gracey's assets, and ordered GRACEY to produce a full accounting

4 of the use of investor funds.  SEC Action Dkt. 4.  On May 23, 2018, Judge Birotte

5 entered a preliminary injunction extending the term of this relief.  SEC Action Dkt. 13.

6 On September 27, 2018, Judge Birotte granted the SEC's Motion for Default Judgment.

7 SEC Action Dkt. 23.  Judge Birotte ordered a permanent injunction prohibiting GRACEY

8 from selling securities.  *Id.*  Judge Birotte also ordered GRACEY to disgorge $4,403,500,

9 finding that the "SEC submitted evidence that Gracey had obtained $4,403,500 through

10 his wrongful conduct." *Id.*  Finally, Judge Birotte ordered an additional civil penalty of

11 $4,403,500. *Id.*

12 **B.    Witness Statements**

13    6.    I have reviewed SEC records memorializing the interviews of

14 approximately 25 victims conducted by the SEC.  I have also reviewed the sworn

15 statements of four victims that were filed in the SEC Action.  In addition, I have

16 interviewed some of the same victims interviewed by the SEC.

17    7.    These victims generally related highly similar experiences with GRACEY.

18 In general, the victims recounted that GRACEY presented himself to them as a wealthy

19 investor from an extremely wealthy British family.  GRACEY told victims that his

20 relatives had founded major companies such as Lloyd's of London and General

21 Dynamics.  The victims said that GRACEY drove expensive cars, to include brands such

22 as Bentley, Ferrari, Maybach and Rolls Royce.  GRACEY invited them to visit him at

23 estates in Clyde Hill and Newcastle, Washington, and Beverly Hills and San Diego,

24 California.  GRACEY represented himself as the owner of these estates.  Some victims

25 reported that GRACEY showed them images of a bank statement purportedly showing

26 that GRACEY had hundreds of millions of dollars in the bank.

27    8.    The victims recounted that GRACEY offered to sell them what GRACEY

28 characterized as "pre-IPO" shares in a company that, GRACEY said, would be

United States v. Keenan Gracey
Complaint-6

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   conducting an initial public offering ("IPO") in the near future.  The victims recounted

2   that GRACEY told them GRACEY had special access to the pre-IPO shares as a result of

3   his or his family's connection with the company.

4       9.      Victims who dealt with GRACEY in 2016 and early 2017 reported that

5   GRACEY described the company as a virtual reality company.  However, victims

6   reported that, beginning in 2017, GRACEY identified the company as a newly-formed

7   government-contracting company that would be created through the merger of three

8   existing companies known as DXC Technology Company ("DXC"), KeyPoint

9   Government Solutions ("KeyPoint") and Vencore, Inc. ("Vencore").  Victims recounted

10  that GRACEY told them his family had a large holding in the parent company of

11  KeyPoint and Vencore.  As a result, GRACEY told victims, GRACEY had purchased a

12  large stake in the new entity, which would be called "Perspecta."  GRACEY offered to

13  sell the victims "pre-IPO" shares of Perspecta stock for $1 per share.  GRACEY told the

14  victims they would be able to redeem their shares for $50 or $60 after the IPO.

15      10.     Victims reported making payments to GRACEY in amounts ranging from

16  thousands of dollars to hundreds of thousands of dollars based on GRACEY's

17  representations that they were purchasing stock in the company GRACEY described.

18  Some victims stated that, at GRACEY's direction, they made these payments to

19  GRACEY in cash.  Others reported paying via wire transfer.  Some victims reported that

20  GRACEY provided them with stock purchase agreements purporting to memorialize the

21  transactions, while others reported receiving no paperwork.  Victims reported that

22  GRACEY told them that a nondisclosure agreement prevented him from sharing

23  extensive information about the company.

24  **C.    Documents Provided by Victims**

25      11.     ***Emails:*** Many of the victims provided the FBI and/or the SEC with

26  documents corroborating their statements.  Included among these were messages the

27  victims received from GRACEY's email account, which has an address of

28

United States v. Keenan Gracey
Complaint-7

1   tijor24@googlemail.com.  Many of the email messages discuss GRACEY's supposed

2   sale of pre-IPO stock to victims.  Following are a few examples of the emails:

3   - A February 17, 2017, email to a victim (referenced hereafter as "Victim
4       2") from GRACEY's account states that "my great grandfather was the
       lord commander of the British empire" and "co-founded General
5       Dynamics."  GRACEY stated that "the current secretary of defense, Jim
6       Mattis, was on the board and worked directly for and with my
       grandfather."  Further, the "CEO of DXC corporation used to work for
7       my father and grandfather at Missy's in London."  The email states that
8       GRACEY had "purchased $100 million of [pre-IPO Perspecta] stock on
9       margin to be sold to accredited and non-accredited investors above and
       beyond the legal limit of my $150 million."  Financial records show that
10      Victim 2 transferred $25,000 to GRACEY on February 20, 2018.

11  - A January 27, 2017, email from GRACEY's email account to another
       victim (referenced hereafter as "Victim 3") states that the email "serves
12      as documentation for an agreement between Keenan Gracey and
13      [Victim 3].  The two named individuals have made an agreement that
       [Victim 3] will pay $100,000 (U.S. currency) to buy Series A stock at
14      $1 share, in a private company with NDA chartered code name
15      NewCorp that intends to go public with an IPO, in 2018 through an
       accredited investment consortium."  Bank records show that Victim 3
16      transferred $100,000 to GRACEY between December 6, 2017 and
17      January 12, 2018.

18  - In a December 30, 2017, email to the victim identified above as Victim
19      1, GRACEY responded to concerns that Victim 1's attorney had raised
       about the proposed stock sales.  In response to a question by the
20      attorney about why no offering materials had been provided, GRACEY
21      stated that he could not provide a private placement memorandum for
       the proposed stock sale because "it is protected by an internal NDA for
22      accredited investors only."  GRACEY's email states that Victim 1's
       attorney was providing "misinformation" and "adding to the confusion."
23      It continued that "my family and I specialize in this and have done for
24      generations.  This is what we do. . .  I can assure you that everything we
       touch is handled in a completely legal manner."  Bank records show that
25      Victim 1 and his family members provided GRACEY with
26      approximately $575,000 between December 30, 2017 and May 15,
       2018.

27

28

United States v. Keenan Gracey
Complaint-8

12.   ***Text Messages:***   Victims also provided copies of text messages they had received from GRACEY.  Following are a few examples of these messages:

- A message from GRACEY to a victim (referenced hereafter as "Victim 4") states that "we have $150 million invested into the private companies (but actually own them fully through veritas capital which my grandfather owns) at $1 per share.  When this goes public it will be worth $60 per share upon opening.  That's 60x return.  This is what we do babe and it's what I specialize in as well.  I care about you, and I feel and know I could have done better for us so if you're interested in me getting you in I'll add you to my end of the investment."  Bank records show that Victim 4 transferred $34,000 to GRACEY between February 16, 2018 and March 2, 2018.

- In a message to a victim (referenced hereafter as "Victim 5"), GRACEY states that "I think you will recall that as I explained that it will be a 5 company merger, including DXC delisting from the stock market."  In other messages with Victim 5, GRACEY attached photos of a Beverly Hills estate as well as high-end sports cars, explaining that "I've attached . . . two videos of my family's estate here so you can understand the surrounding of the area and how most of my neighbors are billionaires."  Bank records show that Victim 5 transferred $20,000 to GRACEY on October 23, 2017.

- In another text message, GRACEY and another victim (referenced hereafter as "Victim 6") discuss Victim 6 providing $500,000 to GRACEY.  GRACEY suggests that Victim 6 "confidently approach others you trust," and asks the Victim 6 to "let me know how things progress towards the $1 mill and $2 mill mark."  Bank records show Victim 6 and his friends and family transferred $745,000 to GRACEY between January 11, 2018 and March 26, 2018.

13.   ***Other Records:***   In addition to the email and text messages, victims also provided numerous other records corroborating their statements.  For example, victims provided copies of "Share Purchase Agreements" between GRACEY and the victims purporting to memorialize the sale of stock by GRACEY to the victims. The Share Purchase Agreements state that GRACEY "is the owner of record of an aggregate of Series A shares in a private company with NDA chartered name NewCorp, which is the

1  product of the merger of parts of DXC, Vencore, Keypoint, and any other businesses

2  involved (the 'Corporation') that intends to go public with an IPO in 2018."

3      14.    Some victims provided copies of a presentation they received from

4  GRACEY describing the benefits of the proposed merger between DXC, Vencore and

5  KeyPoint. This document was publicly available on DXC's investor relations page.

6      15.    Victims also provided documents they received from GRACEY that

7  GRACEY used to evidence GRACEY's supposed wealth. For example, victims

8  provided the government with a photograph GRACEY gave them purportedly depicting a

9  stock certificate reflecting GRACEY's ownership of 65 million shares of Vencore stock.

10  Victims also produced photographs GRACEY sent them of what appeared to be

11  GRACEY's JP Morgan Chase Bank checking account statement. One victim provided a

12  version of this statement reflecting a cash balance of $741,009,998 at the end of March

13  2018. Another version provided by a different victim reflects a cash balance of

14  $117,001,770 for the same account at the same time. I have reviewed records provided

15  by JP Morgan Chase for GRACEY's checking account for this period. According to

16  those records, the actual account balance as of March 30, 2018 was $7,500.01.

17  **D.    Evidence that GRACEY's Solicitations Were Fraudulent**

18      16.    I have also reviewed extensive evidence establishing that GRACEY's

19  investor solicitations were fraudulent. I have reviewed sworn statements of

20  representatives from DXC, KeyPoint and Vencore—the companies involved in the

21  Perspecta merger. Each representative stated that he or she reviewed his or her respective

22  company's relevant business records and determined that neither GRACEY nor his father

23  had any ownership interest in, or other affiliation with his or her respective company. In

24  addition, the statement from the DXC representative states that, as of April 30, 2018,

25  Perspecta had not issued any stock—making GRACEY's claim of owning hundreds of

26  millions of shares impossible.

27

28

United States v. Keenan Gracey
Complaint-10

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

17.     I have also investigated GRACEY's claim to be a member of a British family with extensive financial holdings.  Public records establish that GRACEY is actually a Canadian citizen who has lived in the United States since at least 2006.

18.     An SEC attorney interviewed GRACEY's wife.  GRACEY's wife reported that she met GRACEY in 2011 and married him in 2014.  GRACEY's wife told the SEC attorney that GRACEY had presented himself to her as a professional athlete from the United Kingdom who was new to the United States.  GRACEY told her that he was "involved in stocks" and had a "trust fund."  GRACEY's wife reported that, in early 2015, she learned that GRACEY had been lying about his identity; that GRACEY was Canadian, rather than British; and that GRACEY's father works for Boeing and lives in Bellevue, Washington.  GRACEY's wife moved out in February or March 2015.

19.     I have also reviewed evidence showing that GRACEY's statements about his own wealth were false.  For example, as discussed above, GRACEY invited investors to an estate at 75 Beverly Park Lane in Beverly Hills, which GRACEY represented to be his own, or owned by his family.  Based on internet research, this is an 8-bedroom estate on a five-acre lot, complete with on-site vineyards, a gym, and mini-spa.  This house is currently listed for sale for $47,500,000.  The listing indicates that the property has been for sale since November 2017, meaning that it was listed for sale during the period GRACEY claimed to own the home.  An SEC attorney interviewed the property manager of this estate.  According to the manager, the estate is owned by an individual unrelated to GRACEY.  The property manager stated that GRACEY rented the estate for $7,500 per day between January and April 2018.  I have also reviewed property records for the Clyde Hill, Washington property that GRACEY purported to own, and determined that GRACEY rented this property as well.

20.     I have also reviewed material relating to the luxury cars driven by GRACEY. An SEC attorney interviewed a representative of California Exotic Car Rentals in La Jolla, California.  The representative stated that, beginning in April 2017, GRACEY rented four luxury vehicles:  a Bentley, two Ferraris, and a Lamborghini.  Each

United States v. Keenan Gracey
Complaint-11

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  of these vehicles typically rents for $1,800 per day, though GRACEY negotiated a

2  monthly rate for at least one of the cars.  The representative stated that, when GRACEY

3  became delinquent on his rental payments, he said that his cash was tied up on an

4  upcoming IPO for a company called "Perspecta."

5  **E.    Review of Bank Records**

6      21.    I have also reviewed bank and other financial records showing transactions

7  relating to GRACEY.  The most active bank account controlled by GRACEY appears to

8  be a Wells Fargo account with an account number ending in the digits 1901 (the "1901

9  Account").  While the FBI's analysis of the 1901 Account is not yet complete, a review

10  of the records substantiates victim statements that they wired tens of thousands or

11  hundreds of thousands of dollars to GRACEY at a time.  To date, I have identified over

12  $3.4 million in wire transfers from known victims.  In addition, I have identified over

13  $300,000 in cash deposits between April 2016 and September 2018.

14      22.    As one example, Victim 1 provided wire transfer records showing that on

15  December 30, 2017 Victim 1 initiated an $80,000 wire transfer from Victim 1's Bellevue,

16  Washington Wells Fargo branch.  The records provided by Victim 1 show that the wire

17  was directed to GRACEY's 1901 Account at a Wells Fargo branch in Rancho Santa Fe,

18  California.  The records for the 1901 Account show that GRACEY received an $80,000

19  wire on January 2, 2018, which was the next business day after December 30.  This is one

20  example of many interstate wire transfer transmissions that GRACEY caused in

21  furtherance of his fraud, and is the basis of the wire fraud violation alleged above.

22  //

23  //

24

25

26

27

28

United States v. Keenan Gracey
Complaint-12

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1      23.    Based on the above facts, I respectfully submit that there is probable cause

2 to believe that KEENAN GRACEY did knowingly and intentionally commit the crime of

3 wire fraud, in violation of Title 18, United States Code, Section 1343.

4

5

6                                    MILAS HOWE

7                                    Complainant

Special Agent, Federal Bureau of

8                                    Investigation

9

10     The above-named agent provided a sworn statement attesting to the truth of the

11 contents of the forgoing affidavit on November 9, 2018.  The Court hereby finds that

12 there is probable cause to believe the Defendant committed the offense set forth in the

Complaint.

13     Dated:  November 9, 2018.

14

15

16

17                                    PAULA L. MCCANDLIS

United States Magistrate Judge

18

19

20

21

22

23

24

25

26

27

28

UNITED STATES ATTORNEY
700 STEWART STREET
SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

✎AO 442    (Rev. 08/07)  Warrant for Arrest

# UNITED STATES DISTRICT COURT

| Western | District of | Washington |
|---|---|---|

UNITED STATES OF AMERICA

**WARRANT FOR ARREST**

V.

KEENAN GRACEY

Case Number:

To: The United States Marshal
    and any Authorized United States Officer

YOU ARE HEREBY COMMANDED to arrest _____ KEENAN ALEXANDER GRACEY _____

Name

and bring him or her forthwith to the nearest magistrate judge to answer a(n)

☐ Indictment    ☐ Information    ☑ Complaint    ☐ Order of court

☐ Pretrial Release    ☐ Probation    ☐ Supervised Release    ☐ Violation Notice
   Violation Petition       Violation Petition       Violation

charging him or her with    (brief description of offense)
Wire Fraud

☑ in violation of Title    18    United States Code, Section(s)  1343

☐ in violation of the conditions of his or her pretrial release imposed by the court.

☐ in violation of the conditions of his or her supervision imposed by the court.

| Paula L. McCandlis | |
|---|---|
| Name of Issuing Officer | Signature of Issuing Officer |
| United States Magistrate Judge | 11/09/2018            Seattle, WA |
| Title of Issuing Officer | Date and Location |

| RETURN | | |
|---|---|---|
| This warrant was received and executed with the arrest of the above-named individual at | | |
| DATE RECEIVED | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
| DATE OF ARREST | | |